IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH M. BRUCE, | ) | Case No. 1:21-cv-35 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER**[1] |
| Defendant. | ) | |

Plaintiff, Kenneth M. Bruce, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Bruce challenges the Administrative Law Judge's ("ALJ") negative findings, contending that: (i) the ALJ erred in determining that he did not have a medically determinable impairment of multiple sclerosis; and (ii) the ALJ misevaluated the opinion evidence and reached a residual functional capacity ("RFC") determination that did not accurately portray his functional limitations.  Bruce additionally challenges as a violation of the principle of separation of powers the structure of the Social Security Administration ("SSA"), because under 42 U.S.C. § 902(a)(3), the Commissioner does not serve at the will of the president.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 14.

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence in determining that Bruce did not have a medically determinable impairment of multiple sclerosis; and because any gaps in the ALJ's analysis of the opinion evidence were harmless; and because Bruce lacks standing to raise his constitutional challenge, the Commissioner's final decision denying Bruce's application for DIB must be affirmed.

## I.    Procedural History

Bruce applied for DIB on September 27, 2012.  (Tr. 159).[2]  Bruce alleged that he became disabled on May 31, 2012, due to: 1. enlarged heart; 2. enlarged prostate; 3. slipped discs in his back/neck; 4. high blood pressure; 5. anxiety; and 6. depression.  (Tr. 159, 188).  The SSA denied Bruce's application initially and upon reconsideration.  (Tr. 76-102).  ALJ Frederick Andreas heard Bruce's case on January 27, 2015 and denied his application in a May 1, 2015 decision.  (Tr. 11-24, 29-74).  On July 25, 2016, the Appeals Council declined further review.  (Tr. 1-3).

On September 19, 2016, Bruce filed a complaint to obtain judicial review.  CM/ECF for the N.D. Ohio, No. 1:16-cv-2320, doc. 1.  On February 8, 2017, the court remanded Bruce's case to the Commissioner for further proceedings pursuant to the parties' joint stipulation to remand.  (Tr. 492-93).  And on September 18, 2017, the Appeals Council remanded the case back to an ALJ for further proceedings.  (Tr. 496-99).

On February 27, 2018, the ALJ held a second hearing on Bruce's case and denied his claim in an August 22, 2018 decision.  (Tr. 444-91, 504-19).  On January 25, 2020, the Appeals Council accepted review and remanded Bruce's case back to a different ALJ for further administrative proceedings.  (Tr. 526-29).

---

[2] The administrative transcript appears in ECF Doc. 12.

On August 13, 2020, ALJ Traci Hixson held a third hearing on Bruce's case and denied his claim in a September 10, 2020 decision.  (Tr. 366-82, 390-443).  In doing so, the ALJ determined at Step Two of the sequential evaluation process that Bruce had the severe impairments of asbestosis, obesity, and social phobia.  (Tr. 369).  At Step Four, the ALJ determined that Bruce had the RFC to perform work at the medium exertion level, except:

> [Bruce] can occasionally climb ramps and stairs, but not climb ladders, ropes, or scaffolds, he would not be exposed to extreme temperatures, humidity, concentrated pulmonary irritants, or unprotected heights, he can perform simple routine tasks with simple short instructions and make simple decisions that do not require advanced planning, he would have occasional workplace changes, no fast pace production quotas, and occasional and superficial interaction with coworkers, supervisors, [and the] public, with superficial referring to the ability to ask and answer simple questions, give and follow simple direction, understand and incorporate simple correction or criticism, and he would require a 10 minute break every two hours.

(Tr. 372).

Based on vocational expert testimony that a hypothetical individual with Bruce's age, experience, and RFC could work such available occupations as hand packager, cleaner, and linen room attendant, the ALJ determined that Bruce was not disabled.  (Tr. 379-81).  Bruce did not seek Appeals Council review, rendering the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1484(d) (stating that the ALJ's decision on remand becomes the final decision of the Commissioner if the claimant does not file exceptions disagreeing with the ALJ's decision).  On January 7, 2021, Bruce filed a complaint to obtain judicial review.  ECF Doc. 1.

II.     Evidence

    A.     **Personal, Educational, and Vocational Evidence**

Bruce was born on August 17, 1960.  (Tr. 159).  He was 51 years old on the alleged onset

date and 53 years old on the date last insured.  (Tr. 368).  Bruce had a 9th grade education and no

specialized training.  (Tr. 189).  He had past work as a furnace repairer and janitor, which the

ALJ determined he was unable to perform.  (Tr. 189, 379, 396).

    B.     **Relevant Medical Evidence**

        1.     **Physical Impairments**

On July 19, 2012, Bruce visited Craig Recko, MD, to establish care.  (Tr. 232).  Bruce

reported chest pain and dyspnea on exertion.  *Id.*  Bruce reported that the month before, he spit

up blood and had an episode of vertigo with nystagmus and a "buzzing" feeling in his head.  *Id.*

And Bruce reported a history of enlarged heart, asbestos exposure, enlarged prostate,

hemoptysis, tobacco use, and hypertension.  *Id.*  On physical examination, Bruce had

unremarkable results.  (Tr. 234).  Bruce was diagnosed with: (i) unspecified chest pain;

(ii) dyspnea on exertion; (iii) hemoptysis; (iv) shortness of breath; (v) groin pain; (vi) dizziness;

(vii) vertigo; (viii) hypertension; (ix) tobacco abuse; and (x) asbestos exposure.  (Tr. 234-35).

Dr. Recko stated that although Bruce had a "very concerning presentation/constellation of

symptoms," Bruce was not ill appearing and had a normal EKG.  (Tr. 235).  Dr. Recko

prescribed medication and an inhaler and ordered blood and x-ray testing.  (Tr. 234-35); *see* (Tr.

248) (x-ray results).

On February 7, 2013, Bruce visited Khalid Darr, MD, for a consultative examination.

(Tr. 260-63).  Bruce reported as his chief complaints cervical pain, lower back pain, and

shortness of breath.  (Tr. 260).  On physical examination, Bruce had unremarkable results except

for his self-reports of shortness of breath after walking half a block or climbing five steps; neck stiffness and pain and headache following a workplace injury in 1983; and lower back stiffness and radiating pain following a workplace injury in 1990.  (Tr. 260-62).  Dr. Darr diagnosed Bruce with probable chronic obstructive pulmonary disease ("COPD") and "remote history of cervical and lumbar spine injuries with no residual physical findings."  (Tr. 263).

On November 26, 2013, Bruce began receiving treatment at the Lorain County Free Clinic, Inc.  (Tr. 314).  Bruce reported burning and numbness in his feet, as well as back pain. *Id.*  On physical examination, Bruce had unremarkable results.  (Tr. 315).  On December 3, 2013, Bruce underwent x-ray examination of his chest, which gave unremarkable results.  (Tr. 293).

On December 20, 2013, Bruce returned to the clinic, reporting hypertension and "pins & needles."  (Tr. 318).  On physical examination, Bruce had unremarkable results.  *Id.*  He was diagnosed with hypertension, peripheral neuropathy, and hyperlipidemia.  *Id.*

Bruce's date last insured (and therefore the end of the period under adjudication) was December 31, 2013.  (Tr. 368).  All of the following medical records deal with the period after his date last insured, but may be relevant to the extent they contain evidence of Bruce's functional limitations prior to December 31, 2013.

On March 28, 2014, Bruce reported to the attending physician assistance at the clinic weakness, fatigue, chest pain, and imbalance.  (Tr. 317).  On physical examination, Bruce had a tremor and positive Romberg sign test.  *Id.*  Bruce was diagnosed with hyperlipidemia, motor weakness, and cough.  *Id.*  The attending physician assistant referred Bruce to a neurologist and for an MRI exam.  *Id.*

On April 9, 2014, Bruce underwent MRI examination of his brain, the results of which showed "nonspecific white matter flair changes, not in characteristic orientation for

demyelinating disease, which nonetheless remains in the differential along with sequela of microvascular disease as most common etiologies."  (Tr. 298).

On April 23, 2014, Bruce reported to the attending nurse practitioner at the clinic confusion, balance problems, and peripheral neuropathy.  (Tr. 316).  On physical examination, he coughed frequently.  *Id.*

On June 14, 2014, Bruce visited John Escolas, DO, to establish care.  (Tr. 303).  Bruce reported coughing, fatigue, headaches, and neck pain.  *Id.*  On physical examination, Bruce had unremarkable results.  (Tr. 305).  Dr. Escolas referred Bruce to a gastroenterologist.  *Id.*

On September 16, 2014, Bruce visited Dr. Escolas to review the results of recent stress and colonoscopy tests.  (Tr. 306).  He also reported that over a month earlier he had experienced coughing, headaches, vertigo, visual change, and weakness.  *Id.*  On physical examination, Bruce had unremarkable results.  (Tr. 308).

On October 7, 2014, Bruce reported to Dr. Escola a new episode of chest pain, congestion, coughing, headaches, joint pain, neck pain, rhinorrhea, sinus pain, sneezing, sore throat, swollen glands, and wheezing.  (Tr. 311).  On physical exam, Bruce had unremarkable results.  (Tr. 312).  Dr. Escola diagnosed Bruce with acute pharyngitis, sinusitis, fatigue, tobacco use, and COPD.  *Id.*

On February 13, 2015, Bruce and his wife visited Dhruv R. Patel, MD, for a neurological consultation upon Dr. Escolas's referral.  (Tr. 337).  Bruce's wife reported that Bruce had tremors which began around 2011, memory loss, and "mini blackout episodes" with no recall of what transpired before the blackout.  *Id.*  Bruce also reported a loss of balance, back pain, and numbness in his legs.  (Tr. 337-38).  On physical examination, Bruce had unremarkable results except: (i) "a very subtle head tremor"; (ii) a "mild tremor on the right hand which is only

6

notable on posture"; (iii) mild ataxia; and (iv) no reflexes in the lower extremities.  (Tr. 339-40).

Bruce underwent EMG examination, the results of which showed:

> Cerebrovascular disease with small ischemic changes.  Truly this may represent demyelination as seen in multiple sclerosis.  MRI of the brain was reviewed.  There appears to be some corpus callosum flair in the sagittal views as well as multiple white matter disease.  Our clinical suspicion would, therefore, point towards demyelination as seen in multiple sclerosis.  These findings appear to be of chronic nature and … may have been there for a few years.  His history also appears to be of at least five years duration.
>
> ***
>
> The memory changes are likely related to his underlying insomnia and depression, though, these are not uncommonly seen in demyelination as seen in multiple sclerosis.

(Tr. 340-41).  Dr. Patel stated, however, that additional testing was necessary to complete a diagnosis.  (Tr. 341).  Dr. Patel diagnosed Bruce with essential and other specified forms of tremor, syncope and collapse, and disturbance of the skin.  (Tr. 340).

On April 3, 2015, Bruce underwent MRI examination of his brain, which Dr. Patel confirmed showed demyelination as seen in multiple sclerosis, which "likely may have been present for many years."  (Tr. 783-84).

## 2.    Mental Impairments

During the period under adjudication, Bruce had a history of depression but there were no treatment notes reflecting treatment specifically for mental health.  (Tr. 243, 272).

## C.    Relevant Opinion Evidence

Bruce challenges only the ALJ's evaluation of the opinion evidence concerning his mental health impairments; thus, the court does not summarize the opinion evidence concerning his physical impairments.

### 1.        Consultative Examiner, Ronald G. Smith, PhD

On February 11, 2013, Bruce visited Ronald G. Smith, PhD, for a psychological evaluation.  (Tr. 269).  Bruce reported that he spent most of his time by himself and did not like crowds.  (Tr. 272).  Bruce stated that when faced with crowds he became "too nervous," "can't remember stuff," and could hardly speak.  *Id.*  And Bruce reported that he suffered from anxiety attacks, which were usually triggered by having to speak with others in a crowd.  (Tr. 272-73).  Bruce also reported memory problems after being hit on the head with a steel boom in 1982.  (Tr. 273).  Upon examination, Bruce was able to recall his age and birthdate and the names of current and recent presidents; count backward from 20 to 1 in 27 seconds; say the alphabet in 29 seconds; count from 1 to 40 by threes in 34 seconds; and remember as many as four digits forward and three digits backward.  *Id.*

Dr. Smith diagnosed Bruce with social phobia and assessed a Global Assessment of Functioning score of 55.  (Tr. 274-75).  Dr. Smith opined that Bruce had no limitations with understanding, remembering, or carrying out instructions.  (Tr. 275).  Dr. Smith opined that although Bruce "would probably be capable of maintaining adequate attention … his concentration and persistence may suffer at times due to anxiety in relation to having to deal with other people on the job."  *Id.*  Dr. Smith opined that Bruce could effectively deal with supervisors but "may have" difficulty dealing coworkers.  *Id.*  Lastly, Dr. Smith opined that Smith "may have some difficulty dealing effectively with interpersonal work pressures due to his social anxiety."  (Tr. 276).

### 2.    State Agency Consultants

On February 19, 2013, Caroline Lewin, PhD, evaluated Bruce's mental capacity based on a review of the medical record.  (Tr. 80, 84-86).  Dr. Lewin evaluated Bruce's mental RFC, finding that Bruce was moderately limited in his ability to understand and remember detailed instructions, such that he could complete simple one- to two-step tasks.  (Tr. 84).  Dr. Lewin found that Bruce was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration, such that he could "complete tasks that do not involve extended periods of attention, concentration or more than daily planning."  (Tr. 84-85). Dr. Lewin found that Bruce was moderately limited in his ability to accept instructions and accept criticism, such that he "should not be required to influence others to follow instructions, demands or handle criticism."  (Tr. 85).  Lastly, Dr. Lewin found that Bruce had moderate limitations responding to changes, such that he could "complete tasks where there is no more than occasional change; and when change occurs it can be explained in simple terms."  *Id.*  On June 2, 2013, Roseann Umana, PhD, concurred with Dr. Lewin's findings.  (Tr. 94-95, 98-100).

### D.    Relevant Testimonial Evidence

Because the issues Bruce raises in this action do not implicate his testimony, it is unnecessary to summarize the entirety of his testimony at the various ALJ hearings.  However, at the February 27, 2018 hearing, the ALJ noted the medical records indicating "a slight head tremor and a mild hand tremor" and asked Bruce if he was having those issues prior to December of 2013.  (Tr. 478).  Bruce stated he'd been having them "quite a while before that," but was afraid to tell anyone at work because they "always like to get rid of everybody so if they would." *Id.*  The ALJ asked Bruce if he was able to do the job while he had the tremor, and Bruce stated, "Yeah, I was still able to do it.  But it just kept getting worse."  *Id.*

At the February 27, 2018 hearing, the ALJ also asked vocational expert ("VE") Eric Dennison to assume a hypothetical person with Bruce's age, education, and work experience, but, in relevant part, limited to: (i) medium work; (ii) completing tasks that did not involve extended periods of attention, concentration, and more than daily planning; (iii) completing tasks where there was no more than occasional change, with changes explained in simple terms and job duties; (iv) interacting superficially with others, meaning no arbitration, negotiation, conflict resolution, management, supervision, or responsibility over the welfare of others; and (v) handling occasional criticism. (Tr. 481, 484). The VE testified that such an individual could perform work as linen room attendant, marker, and tumbler. (Tr. 486-87).

At the August 13, 2020 hearing, the ALJ asked VE Deborah Lee to assume a hypothetical person with Bruce's age, education, and work experience but, in relevant part, limited to: (i) medium work; (ii) performing simple, routine tasks with simple, short instructions, meaning decisions that did not require advances planning; (iii) occasional workplaces changes; (iv) no fast-paced production quotas; (v) occasional and superficial interaction with coworkers, supervisors, and the public, with superficial referring to the ability to ask and answer simple questions, give and follow simple direction, and understand and incorporate simple correction or criticism. (Tr. 419-20). The VE testified the hypothetical individual could perform work as a hand packager, cleaner, and linen room attendant. (Tr. 421). The VE testified her answer would not change if the hypothetical were limited to 10-minute breaks every two hours. *Id.* If reduced to no interaction with the public and no tandem work, the VE testified the individual could work as an inspector hand packager, cleaner, and marker. (Tr. 423-24).

The VE testified that the *Dictionary of Occupational Titles* ("DOT") defined reasoning level one as requiring one- or two-step instruction, but the DOT was silent with respect to one- or

10

two-step tasks.  (Tr. 437-39).  The VE testified that it was difficult to say with certainty what counted as a one-step or two-step task because a task can be comprised of elements, which themselves could be described as separate tasks.  (Tr. 437-38, 440-41).  She testified, however, that folding clothes or packaging boxes could be described as one task, even if the task could be subdivided.  (Tr. 438).

## III.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's

reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

**B.     Step Two: Multiple Sclerosis as a Medically Determinable Impairment**

Bruce argues that the ALJ erred when she failed to identify his multiple sclerosis as a medically determinable impairment. ECF Doc. 13 at 8-10. Bruce argues that the record evidence during the period under adjudication contained references to many of the signs and symptoms associated with multiple sclerosis, such as: (i) references to motor weakness, back pain, burning and numbness, and dizziness; (ii) diagnoses of vertigo, foot numbness, and peripheral neuropathy; and (iii) his hand tremors and brain lesion. ECF Doc. 13 at 10-11. Bruce argues that Dr. Patel's findings confirmed a diagnosis of multiple sclerosis dating back five years. ECF Doc. 13 at 10-11. He argues that just because the diagnosis could not be confirmed until after his date last insured, it did not mean the disease was not present during the relevant period. ECF Doc. 13 at 11. And he argues the error was harmful because, by virtue of multiple sclerosis not being determined to be a medically determinable impairment, it was not considered in fashioning the RFC. ECF Doc. 13 at 12.

The Commissioner responds that substantial evidence supports the ALJ's finding that multiple sclerosis was not a medically determinable impairment. ECF Doc. 16 at 18-20. The Commissioner argues that Bruce's self-reported symptoms were insufficient to establish the existence of a medically determinable impairment. ECF Doc. 16 at 20. The Commissioner argues that there was no objective evidence of hand tremors during the period under adjudication

and Dr. Patel only suggested that Bruce's multiple sclerosis had been present for five years based on Bruce's self-reported symptom history.  ECF Doc. 16 at 20-21.

In his reply brief, Bruce argues that the ALJ failed to explain why his multiple sclerosis was not a medically determinable impairment and that the Commissioner relies on post hoc rationalizations for why it wasn't.  ECF Doc. 18 at 5.

At Step Two, a claimant must show that he has a "severe" medically determinable impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  A condition must first qualify as a "medically determinable impairment" before the ALJ determines whether it is "severe."  20 C.F.R. § 404.1521.  And whether a condition qualifies as a "medically determinable impairment" is determined exclusively on the basis of objective medical evidence.  *Id.*  ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).").  If the ALJ concludes that a condition is not a "medically determinable impairment," the ALJ need not consider the condition in assessing the RFC.  *Rouse v. Comm'r of Soc. Sec.*, No. 2:16-cv-0223, 2017 U.S. Dist. LEXIS 6172, at *11 (S.D. Ohio Jan. 17, 2017).  A Step Two error is harmless, however, if the ALJ considers the impairment at later steps.  *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in determining that Bruce did not have medically determinable impairment of multiple sclerosis during the period under adjudication.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ's findings at Step Two did not address Bruce's multiple sclerosis.  (Tr. 369-70).  However, the ALJ addressed the condition at Step Four, stating:

> Records and diagnostic imaging subsequent to the date last insured reflect complaints of lower extremity weakness, confusion, and balance problems, as well as a diagnosis of treatment for multiple sclerosis after the claimant was referred by his physician, [Dr.] Escolas … to a neurologist, [Dr.] Patel … in

2015.[] (8F, 14-30; 9F, 3-4, 18-20; 10F; 11F; 12F; 14F).  However, during the
relevant period, there are simply no anatomical, physiological or psychological
abnormalities shown by medically acceptable clinical or laboratory diagnostic
techniques as required by 20 CFR 404.1521 to substantiate the claimant's most
serious complaints described at the hearing.

(Tr. 375).  Two paragraphs later, after discussing obesity and the consistency of Bruce's stated

severity of his symptoms with the evidence, the ALJ included a nearly identical paragraph.  (Tr.

376-77).  Although framed in terms of consistency between Bruce's subjective symptom

complaints and the objective medical evidence, a commonsense reading of the entire ALJ

decision – including the ALJ's citation to 20 C.F.R. § 404.1521 – indicates that the ALJ's

reasoning applied to both her Step Two and Step Four findings.  *Buckhanon ex rel. J.H. v Astrue*,

368 F. App'x 674, 678-79 (7th Cir. 2010).

As applicable to her Step Two findings, the ALJ applied proper legal standards and

reached a decision supported by substantial evidence.  Because Bruce's application concerned a

claim for DIB, he had to show that he was disabled on or before the expiration of his insured

status – December 31, 2013.  *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984); *see also* 42

U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130.  On or before December 31, 2013, no doctor

had diagnosed multiple sclerosis; Bruce had not been evaluated or treated for multiple sclerosis;

and none of the treatment notes mentioned multiple sclerosis as a possible diagnosis.  Although

Bruce claims that he had symptoms during the period under adjudication that were consistent

with those attributable to multiple sclerosis, without corroborative objective medical findings,

that is not enough.  20 C.F.R. § 404.1521; *see* SSR 16-3p, 2016 SSR LEXIS 5, at *5-6 (Mar. 16,

2016).  The corroborative objective medical findings confirming a diagnosis of multiple sclerosis

did not occur until Dr. Patel's interpretation of Bruce's MRI on February 13, 2015 – over a year

after the date last insured.  (Tr. 338-41, 781-84).

14

Bruce argues that Dr. Patel's findings regarding Bruce's multiple sclerosis should have been found to relate back to the period under adjudication.  (Tr. 340-41).  He points out that Dr. Patel had a "clinical suspicion" that Bruce may have had multiple sclerosis as of February 2015 which "may have been there for a few years.  His history also appears to be of at least five years duration."  (Tr. 340); *see* ECF Doc. 13 at 10-11.  "Evidence relating to a later time period is only minimally probative … and is only considered to the extent it illuminates a claimant's health before the expiration of his or her insured status."  *Jones v. Comm'r of Soc. Sec.*, 121 F.3d 708, *3-4 [published in full-text format at 1997 U.S. App. LEXIS 18448] (6th Cir. 1997) (unpublished) (citations omitted).  The ALJ specifically discussed Bruce's consultations with Dr. Patel but found that during the relevant period there were "no anatomical, physiological or psychological abnormalities shown by medically acceptable clinical or laboratory diagnostic techniques required by 20 CFR 404.1521."  (Tr. 375).  The ALJ's findings in this regard were consistent with the regulations because she focused on the absence of multiple-sclerosis-corroborative findings – tremors and a brain lesion – during the period under adjudication.  (Tr. 337, 375).

Moreover, the ALJ's discussion of Bruce's symptoms and consultation with Dr. Patel shows that the ALJ considered Bruce's multiple sclerosis in making her RFC analysis.  Thus, any error the ALJ may have made by not determining that Bruce's multiple sclerosis was a medically determinable impairment was harmless.  *Nejat,* 359 F. App'x at 577; *see also, e.g.*, *Robin v. Comm'r of Soc. Sec.*, No. 2:21-cv-96, 2022 U.S. Dist. LEXIS 31391, at *16 (S.D. Ohio Feb. 23, 2022); *Cotton v. Comm'r of Soc. Sec.*, No. 2:20-cv-5477, 2021 U.S. Dist. LEXIS 226465, at *17-19 (S.D. Ohio Nov. 24, 2021); *Bobb v. Comm'r of Soc. Sec.*, No. 2:19-cv-5612, 2021 U.S. Dist. LEXIS 34169, at *4 (S.D. Ohio Feb. 24, 2021).  And Bruce has not otherwise

challenged the ALJ's determination that Bruce's subjective symptom complaints concerning his multiple sclerosis were inconsistent with the objective evidence *during the period under adjudication*. *See generally* ECF Doc. 13; ECF Doc. 18; *see McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). As noted at page 9 above, the record shows that Bruce acknowledged he was able do perform his work during the period under adjudication despite experiencing what may have been early signs of multiple sclerosis. Thus, even if it was *possible* that Bruce had multiple sclerosis in 2012 and 2013, the ALJ had insufficient evidence to find that the condition significantly limited Bruce's ability to perform basic work activities during the period under consideration.

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence in conducting her Step Two analysis, the ALJ's conclusion that Bruce's multiple sclerosis was not a medically determinable impairment cannot be second-guessed by this court. *Rogers*, 486 F.3d at 241; *O'Brien*, 819 F. App'x at 416. And, moreover, any alleged error was rendered harmless by the ALJ's consideration of Bruce's multiple sclerosis at later steps. *Nejat*, 359 F. App'x at 577.

### C.    Step Four: Weighing of Opinion Evidence and RFC

Bruce argues that the ALJ failed to apply proper legal standards in weighing the opinion evidence concerning his mental health impairments. ECF Doc. 13 at 12-17. Specifically, Bruce argues that the ALJ gave inadequate reasons for rejecting their mental RFC findings, when Dr. Smith's opinion included findings that were consistent with those of the state agency consultants. ECF Doc. 13 at 13-16. Bruce argues that the ALJ could not rely on the change in the regulations after the state agency consultants issued their opinion to discount it. ECF Doc. 13 at 16. And Bruce argues that it was "relatively unimportant" that Dr. Smith did not find that

16

Bruce was limited to one- to two-step tasks because "it is likely that Dr. Smith would not provide exactly the same opinions as the state agency doctors." ECF Doc. 13 at 16.

The Commissioner responds that the ALJ reasonably weighed Dr. Smith's opinion more heavily than those of the state agency consultants. ECF Doc. 16 at 21-24. The Commissioner argues that the state agency consultants' mental RFC finding limiting Bruce to one- to two-step tasks referred to Bruce's ability to understand and carry out instructions, whereas Dr. Smith found no limitations in that area of mental functioning. ECF Doc. 16 at 22. The Commissioner argues that the change in the applicable regulations was relevant. ECF Doc. 16 at 23. And the Commissioner argues that the ALJ's mental RFC findings were otherwise consistent with the state agency consultants' findings and that none of the jobs the VE testified to involved significant social interaction. ECF Doc. 16 at 22-23. The Commissioner also argues that Bruce has not pointed to evidence that greater limitations were warranted. ECF Doc. 16 at 24.

At Step Four of the sequential evaluation process, the ALJ must weigh every medical opinion that the SSA receives. 20 C.F.R. § 404.1527(c). Under the regulations applicable to Bruce's claim, the ALJ must determine the weight due to an evaluating source opinion by considering the examining and treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the opinion was issued by a specialist. 20 C.F.R. § 404.1527(c)(1)-(5); *see* SSR 06-03p, 2006 SSR LEXIS 5, at *6-7 (2006). However, the ALJ need not give an exhaustive factor-by-factor analysis. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). It is enough that the ALJ consider the opinion, assign weight, and give an explanation as to why the conflicting aspects of the opinion were rejected. 20 C.F.R. § 404.1527(f)(2); *see also* SSR 96-6p, 1996 SSR LEXIS 3, at *6 (July

17

2, 1996); SSR 96-8p, 1996 SSR 5, at *20 (July 2, 1996); SSR 06-03p, 2006 SSR LEXIS 5, at *15-16.

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in giving only partial weight to the state agency consultants' mental RFC findings. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by considering the evidence and clearly stating the weight assigned to each source's opinion. 20 C.F.R. § 404.1527(c), (f)(2); (Tr. 378).  And the ALJ provided sufficiently clear reasons for giving the state agency consultants' opinion "partial weight" when she stated:

> While these opinions support a finding that the claimant required functional limitations to account for his severe mental impairment, the mental criteria changed since the opinions were given and the mental [RFC] was not consistent with the opinion of Dr. Smith who felt that the claimant was capable of understanding, remembering, or carrying out instructions.  Further, Dr. Smith's opinion made no reference to limitation of completing simple one to two step tasks.  The opinions were supported by the diagnosis of social phobia.  (6F).

(Tr. 378); *see* 20 C.F.R. § 404.1527(f)(2).

The changes in the paragraph B criteria could potentially be relevant under the regulations as "other factors," but it is not clear why the changes to the paragraph B criteria would bear on the functional limitations the state agency consultants assessed in their opinion. 20 C.F.R. § 404.1527(c)(6).  Paragraph B findings are distinct and separate from RFC findings. SSR 96-8p, 1996 SSR LEXIS 6, at *13.  Concentration, persistence, and pace, one of the areas under which Bruce argues the ALJ erred, did not change. *Maynard v. Berryhill*, No. 2:17-cv-04131, 2018 U.S. Dist. LEXIS 167350, at *13 (S.D. W. Va Sept. 28, 2018).  And the changes to the areas of social functioning were not substantial. *See Montgomery v. Comm'r of Soc. Sec.*, No. 3:17-CV-00617, 2019 U.S. Dist. LEXIS 53646, at *15 (W.D. Ky. Mar. 29, 2019); 75 FR 51340-51341.

Even if the changes to the paragraph B criteria were not proper for the ALJ to consider as a basis for giving less weight to the state agency consultants' opinion, the error was harmless. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009). As the Commissioner correctly points out, the ALJ's mental RFC findings were in some respects consistent with those of the state agency consultants. *See Wilson v. Comm'r of Soc. Sec.*, 738 F.3d 541, 547 (6th Cir. 2004). The ALJ's finding that Bruce was limited to simple decisions that did not require advanced planning and with ten-minute breaks every two hours was consistent with the state agency consultants' opinion that Bruce could complete tasks that did not involve extended periods of attention, concentration or more than daily planning. *Compare* (Tr. 85, 99), *with* (Tr. 372). And the ALJ's finding that Bruce was limited to occasional workplace changes, no fast-paced production, and simple instructions was consistent with the state agency consultants' finding that Bruce could complete tasks with no more than occasional changes and that changes be explained in simple terms. *Compare* (Tr. 86, 100), *with* (Tr. 372).

The ALJ's finding that Bruce could only occasionally and superficially interact with others was not consistent with the state agency consultants' finding that Bruce should not be required to "influence others to follow instructions, demands or handle criticism." *Compare* (Tr. 85, 100), *with* (Tr. 372). But any error would be rendered harmless by the testimony of the VE at the 2018 ALJ hearing that the job of linen attendant could still be performed even if the hypothetical individual could not work in a job that required arbitration, negotiation, conflict resolution, management, or supervision of others, which would account for the limitation to not instruct others. (Tr. 484, 486). The state agency consultants' opinion that Bruce should not handle criticism would be inconsistent with Dr. Smith's opinion that Bruce "should be able to deal effectively with supervisors." (Tr. 275). The inconsistency between Dr. Smith's and the

state agency consultants' opinions, which the ALJ relied on, however, was a proper and independent basis upon which to reject that portion of the state agency consultants' opinion. 20 C.F.R. § 404.1527(c)(4).

The ALJ's consistency finding could also independently support the ALJ's decision to discount the state agency consultants' finding that Bruce could only perform one- to two-step tasks.  As the Commissioner correctly points out, the state agency consultants made that finding with respect to Bruce's ability to remember and understand instructions, whereas Dr. Smith found no limitations in that area of mental functioning.  (Tr. 84, 98-99, 275).  And Dr. Smith's objective exam findings, as well as the unremarkable mental status exam findings in the record, constituted substantial evidence supporting the ALJ's conclusion.  (Tr. 373-75); *see also* (Tr. 261, 273).

Because the ALJ adequately explained the weight she assigned to the state agency consultants' opinion and any errors the ALJ may have made were harmless, the court finds no basis for remand on account of Bruce's Step Four challenge.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241; *Bowen*, 478 F.3d at 746.

## D.    Separation of Powers

Bruce argues that former-Commissioner Andrew Saul's appointment violated the principle of separation of powers because 42 U.S.C. § 902(a)(3) provides for a six-year term and makes the Commissioner removable only upon a finding of neglect of duty or malfeasance in office, which was similar to the statue held to violate separation of powers in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*").  ECF Doc. 13 at 17-18.  Therefore, Bruce argues that the Commissioner had no authority to carry out any

20

functions of his office, and by extension, neither the ALJ nor the Appeals counsel had authority to adjudicate Bruce's application, necessitating a remand.  ECF Doc. 13 at 18-19, 21.

The Commissioner concedes that 42 U.S.C. § 902(a)(3) violates the principle of separation of powers but argues that Bruce is nevertheless not entitled to a remand on that basis because, under *Collins v. Yellen*, 141 S. Ct. 1761 (2021), he has not shown that he was actually harmed by the unconstitutional restriction on the president's removal authority.[3]  ECF Doc. 16 at 6.  Specifically, the Commissioner argues that Bruce was not harmed because the ALJ's appointment was ratified in July 2018 by then-Acting Commissioner Nancy Berryhill, who was not subject to the unlawful removal provision and was presumptively removable at-will.  ECF Doc. 16 at 6, 8-10.  The Commissioner alternatively argues, relying on Justice Kagan and Justice Thomas's concurring opinions in *Collins*, that Bruce cannot show actual harm because he cannot show the unconstitutional removal provision inflicted compensable harm on him.  ECF Doc. 16 at 7-8, 10-13.  The Commissioner argues that because Bruce has not contested whether Saul was properly appointed under the Appointments Clause, he did not exercise authority he did not possess and, by extension, neither did the ALJ.  ECF Doc. 16 at 10-11.  The Commissioner argues that Bruce must show that the president's inability to remove Saul under the removal provision affected the ALJ's decision in this case, which the Commissioner argues Bruce has not done.  ECF Doc. 16 at 13.

In his reply brief, Bruce argues that the court need not reach the constitutional issue if it determines a remand is warranted on another basis.  ECF Doc. 18 at 6.  Alternatively, Bruce adds to his constitutional argument that he has standing under *Collins* because: (i) several out-of-

---

[3] Because the court concludes that, under *Collins* and related caselaw, Bruce lacks standing to raise his constitutional challenge, the Commissioner's other alternative theories for why remand on this issue is not warranted (as well as Bruce's reply to those theories) are not addressed.

circuit district courts have held that an adverse decision constitutes an injury in fact; (ii) 42 U.S.C. § 902(a)(3) is unconstitutional; and (iii) he is entitled to relief. ECF Doc. 18 at 7-10.  He argues that he is entitled to relief because he was deprived a constitutionally valid ALJ and Appeals Council adjudication process and decision. ECF Doc. 18 at 10.  Bruce argues that the Commissioner waived any argument with respect to the unconstitutional actions of the Appeals Council by not specifically addressing it. ECF Doc. 18 at 10-12.  Even if not waived, he argues he would be entitled to relief, reiterating that the Commissioner had no valid delegable authority. ECF Doc. 18 at 12-15.  Bruce argues that because his claim asserts a structural constitutional error, he did not need to show direct prejudice. ECF Doc. 18 at 16-18.  Even if cause were required, he argues the constitutional violation itself is sufficient. ECF Doc. 18 at 18-22.  And more specifically, he argues that the changes to Hearings, Appeals, and Litigation Law Manual ("HALLEX"), the way musculoskeletal impairments were evaluated, and hearing procedures implemented by Saul affected him. ECF Doc. 18 at 20, 26.

The judicial power of the federal courts "is limited to 'cases' and 'controversies.'" *Muskrat v. United States*, 219 U.S. 346, 356 (1911); U.S. Const. art. III § 2.  From the case-and-controversy requirement of the Constitution stems the doctrine of standing, which asks "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009).  This ordinarily requires that a plaintiff show "(1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).  But when a plaintiff challenges a statutory restriction on the president's power to remove an executive officer, the plaintiff can

establish standing "by showing that [he] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void." *Collins*, 141 S. Ct. at 1788 n.24.

Both in *Seila Law* and *Collins*, the Supreme Court confronted separation-of-powers challenges to the structure of single-head executive agencies.  The Court first addressed the structure of the Consumer Finance Protection Bureau ("CFPB") under 12 U.S.C. § 5491(c)(3), which made the CFPB Director removable only for "inefficiency, neglect of duty, or malfeasance." *Seila Law*, 140 S. Ct. at 2191-92.  Without addressing whether the petitioner had standing to bring its separation-of-powers argument in the district court in the first instance,[4] the Court held that § 5491(c)'s restrictions on the president's authority to remove the single head of the CFPB violated the principle of separation of powers. *Id.* at 2197.

The Court then addressed the structure of the Federal Housing Finance Agency ("FHFA") under 12 U.S.C. § 4512(b)(2), which made the Director of the FHFA removable by the president only "for cause." *Collins*, 141 S. Ct. at 1770.  The challenge came to the Court after the FHFA amended the formula used to calculate the amount of dividends Fannie Mae and Freddie Mac were required to pay to the U.S. Department of the Treasury. *Id.* at 1774-75.  The Court determined first that the companies' shareholders had standing to bring their constitutional claim because: (1) the FHFA transferred the value of their property rights in the companies (their net worth) to the Treasury via the variable dividend formula, constituting an injury in fact; (2) the injury was traceable to the FHFA's adoption and implementation of the amendment; and (3) the injury was potentially redressable. *Id.* at 1779.  The Court concluded that a straightforward application of *Seila Law* led to the conclusion that § 4512(b)(2)'s removal

---

[4] *Seila Law* instead determined that the petitioner had appellate standing because (1) the petitioner had been compelled to comply with a civil investigative demand from the CFPB and provide documents it would prefer not to, (2) the injury was traceable to the appellate court's decision, and (3) the injury would be redressed by a reversal of the appellate court's decision.  140 S. Ct. at 2196.

restrictions also violated the principle of separation of powers.  *Id.* at 1783-84.  Justice Kagan,

somewhat prophetically, predicted the structure of the SSA would be "next on the chopping

block."  *Id.* at 1802 (Kagan, J., concurring).

Bruce lacks standing to challenge the constitutionality of the SSA's structure.  Bruce

argues that he has standing because his administrative proceedings were conducted pursuant to

policies and regulations implemented by Saul.  ECF Doc. 13 at 19; ECF Doc. 18 at 20.  But

that's not enough.  "[T]he unlawfulness of the removal provision does not strip the

[Commissioner] of the power to undertake the other responsibilities of his office."  *Collins*, 141

S. Ct. at 1788 n.23.  As Justice Thomas's concurring opinion clarified, Bruce must do more than

point to a conflict between 42 U.S.C. § 902(a)(3) and the Constitution; he must show some

action on the part of Saul that was unlawful and harmful to him.  *See id.* at 1790-91 (Thomas, J.,

concurring)[5]; *see also Bryan v. Comm' of Soc. Sec.*, No. 2:21-cv-2835, 2022 U.S. Dist. LEXIS

31392, at *19 (S.D. Ohio Feb. 23, 2022) ("[C]ourts across the country have uniformly concluded

that the allegedly unconstitutional nature of § 902(a)(3) does not require remand.") (collecting

cases).  More to the point, Bruce must show that the policy and regulatory changes implemented

by Saul adversely affected him.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 n.1

(1992) ("[T]he injury must affect the plaintiff in a personal and individual way.").  He has

pointed to changes to HALLEX, the way musculoskeletal impairments are evaluated, and

administrative hearing procedures, but he has not argued how those changes made it more or less

likely that his applications would be denied.  This is in stark contrast to the shareholders in

---

[5] Bruce contests the weight due to the concurring opinions in *Collins*, stating that they represent "merely
individual justice's personal views."  ECF Doc. 18 at 17 n.6.  Bruce is correct that concurring opinions,
even those of a Supreme Court Justice, are not binding.  Nevertheless, the court finds Justice Thomas's
concurrence highly persuasive to clarifying the necessary showing of standing in separation-of-powers
cases.

*Collins*, who identified an injury (the loss of net worth in companies in which they owned shares) traceable to the Director's unlawful action (amending the formula to calculate dividends). 141 S. Ct. at 1779.

Bruce attempts to avoid the lack a traceable injury with out-of-Sixth Circuit district court cases which have found standing based on the following reasoning: (i) § 902(a)(3) is unconstitutional; (ii) the Commissioner therefore exercised improper authority; (iii) because the Commissioner exercised improper authority, she had no authority to delegate; and (iv) because the Commissioner had no delegable authority, the ALJ and the Appeals Council lacked any authority to decide the cases before them.  *Sylvia v. Kijakazi*, No. 5:21-CV-076, 2021 U.S. Dist. LEXIS 194953, at *7-9 (N.D. Tex. Sept. 13, 2021); *Albert v. Kijakazi*, No. 1:21-cv-0004, 2021 U.S. Dist. LEXIS 146471, at *5-8 (D. Ala. Aug. 5, 2021); *Tafoya v. Kijakazi*, No. 21-cv-00871, 2021 U.S. Dist. LEXIS 142283, at *8-10 (D. Colo. July 29, 2021).  But this reasoning conflicts directly with the Supreme Court's conclusion in *Collins* that the unconstitutionality of a removal provision does not strip the agency head "of the power to undertake the responsibilities of his office."  *Collins*, 141 S. Ct. at 1788 n.23.

Without a harm traceable to an unlawful action by the Commissioner, Bruce does not have standing to challenge the constitutionality of § 902(a)(3).  *See, e.g.*, *Rives*, No. 1:20-cv-2549, 2022 U.S. Dist. LEXIS 41167, at *66-70; *Wicker v. Kijakazi*, No. 20-4771, 2022 U.S. Dist. LEXIS 15584, at *27-30 (E.D. Pa. Jan. 28, 2022); *S.W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-05602, 2021 U.S. Dist. LEXIS 219306, at *20-21 (W.D. Wash. Nov. 12, 2021); *see also Rivera-Herrera v. Kijakazi*, No. 1:20-cv-01326, 2021 U.S. Dist. LEXIS 225340, at *21 (E.D. Cal. Nov. 21, 2021) (collecting additional cases rejecting constitutional challenges to § 902(a)(3) for lack of a fairly traceable harm).

## IV.  Conclusion

Because Bruce lacks standing to raise his constitutional challenge and because the ALJ otherwise applied proper legal standards, reached a decision supported by substantial evidence, and did not reversibly err, the Commissioner's final decision denying Bruce's application for DIB is affirmed.

**IT IS SO ORDERED.**

Dated: May 17, 2022

Thomas M. Parker<br>
United States Magistrate Judge